William **DIRMA** and Linda **Dirma, Plaintiffs,**

v.

**UNITED STATES of America and Department of the Navy, Defendants.**

**No. 87 CIV 0380 (TCP).**

United States District Court, E.D. New York.

Sept. 16, 1988.

Richard A. Cardali by John A. Bianchi, New York City, for plaintiffs.

John R. Bolton, Asst. Atty. Gen., Andrew J. Maloney, U.S. Atty., E.D.N.Y., Janis G. Schulmeisters, Atty. in Charge, Torts Branch, Civil Div., U.S. Dept. of Justice by Debra F. Gambrill, William L. Peck, Trial Attys., New York City, for defendants.

## MEMORANDUM AND ORDER

PLATT, Chief Judge.

Plaintiff, William Dirma, sues for damages for personal injuries he allegedly sustained on June 26, 1985 while he was working on some scaffolding which he says was on the "mess" deck of the Destroyer USS THORN while the same was being refurbished in a drydock of the Coastal Dry Dock & Repair Corp. (hereinafter "Coastal") in the Brooklyn Navy Yard on June 26, 1985. Plaintiff William Dirma claims his injuries were caused by the negligence of the defendant in the erection of the scaffolding.

The parties stipulated to the following facts:

1. William and Linda Dirma are married and are residents of the State of New York residing at 149–33 257th Street, Rosedale, New York 11422. William Dirma was born on September 15, 1957, and Linda Dirma was born on December 12, 1961.

2. The defendant is the United States of America. The Department of the Navy is an agency and instrumentality of the United States within the Department of Defense. USS THORN is a United States naval vessel.

3. On March 6, 1985, USS THORN arrived in New York and moored in an area commonly referred to as the Brook-

lyn Navy Yard, a ship repair facility owned by the City of New York, the material part of it, where the USS THORN was located, having been leased to Coastal. The USS THORN arrived at Coastal's facility in order to have certain repairs done to it, pursuant to a written contract and specifications issued in accordance therewith. On or about March 6, 1985, the USS THORN was moored in the Brooklyn Navy Yard and was dry-docked by Coastal on June 26, 1985. On June 26, 1985, William Dirma was employed by Coastal. Dirma had been employed by Coastal starting in June, 1981.

The contract for repairs of the USS THORN entered into between Coastal and the United States, through the Naval Sea Systems Command, a Command within the Department of the Navy, at the Brooklyn Navy Yard, Brooklyn, New York, provided, *inter alia:*

CLAUSE 4.  PERFORMANCE

\* \* \* \* \* \*

(d) Except as otherwise provided in the job order, the Contractor shall furnish all necessary material, labor, services, equipment, supplies, power, accessories, facilities, and such other things and services as are necessary for accomplishing the work specified in the job order subject to the right reserved in the Government under Clause 9 hereof.

CLAUSE 10.  LIABILITY AND INSURANCE

(a) The Contractor shall exercise reasonable care and use his best efforts to prevent accidents, injury, or damage to all employees, persons and property, in and about the work, and to the vessel or part thereof upon which work is done.

\* \* \* \* \* \*

CLAUSE 24.  DEPARTMENT OF LABOR SAFETY AND HEALTH REQUIREMENTS FOR SHIP REPAIRING

Attention of the Contractor is directed to the Occupational Safety and Health Act of 1970 (29 U.S.C. §§ 651–678), and to the Occupational Safety and Health Standards for Ship Repairing (29 CFR 1915), promulgated under Public Law 85–742, amending section 41 of the Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C. § 941), and adopted by the Department of Labor as occupational safety or health standards under section 6(a) of the Occupational Safety and Health Act of 1970 (29 CFR 1910.13). These regulations apply to all ship repair and related work, as defined in the regulations, performed under this contract on the navigable waters of the United States including any drydock or marine railway. Nothing contained in this contract or any job order thereunder shall be construed as relieving the Contractor from any obligations which it may have for compliance with the aforesaid regulations.

Under Work Item 472–90–002, Coastal performed repairs outside the galley.

Under the terms of the above contract, Coastal's Scaffolding Department was required to erect scaffolding at the job site on the vessel (See Dep. p. 38). Plaintiff William Dirma did not see the particular scaffolding erected on which he was allegedly injured (Dep. pp. 38, 40), nor did he see anyone from the Navy erect it (Dep. p. 41). The distance between the deck and the overhead at the area where the plaintiff alleges he was working is approximately nine feet.

Plaintiff received his daily work assignments from his Coastal supervisor (Dep. p. 43). Plaintiff took orders from Coastal and not the ship's crew (Dep. p. 86). No one from the United States Navy escorted him to his work space on the day of his alleged accident (Dep. p. 47).

Neither plaintiff Dirma, nor anyone else, had noticed anything wrong with the scaffolding on which he was allegedly working before he allegedly injured himself (Dep. pp. 55, 57). If plaintiff had noticed anything wrong with the scaffolding, he would have notified his Coastal supervisor (Dep. p. 63).

Coastal had a safety department to which plaintiff Dirma would go concerning safety problems (Dep. p. 65). Plaintiff did not report his injury to anyone in the United States Navy at the time it allegedly happened nor thereafter until December 1985 (Dep. p. 79). Plaintiff returned to work on October 28, 1985 (Coastal Dry Dock medical report).

Plaintiff and his co-worker Manual Garcia testified that they were working on June 26, 1985, on a scaffolding putting insulation in the overhead or ceiling of the "mess" deck. The scaffolding, according to them, was six feet high, four feet wide, and six to seven feet long.

Plaintiff took pictures of allegedly similar scaffolding located on a shore site in Melville, N.Y. (Exhs. 1–6).

Plaintiff contended at the trial that the Navy personnel assigned to the USS THORN took down the scaffolding each Friday evening and erected it every Monday morning so that the ship's personnel would have access to the mess room for their meals over the weekends. Indeed, Mr. Garcia testified that he saw the sailors erecting the scaffold on Wednesday morning, June 26, immediately prior to the work by the plaintiff himself.

Plaintiff testified he was climbing down one of the ladders on the side of the scaffolding and was on the last rung, about 24 inches from the ground, when the scaffolding gave way and he turned his left knee and fell on the deck.

Fred DeDiglio, the General Superintendent at Coastal, said that the installation and erection of the scaffolding was done under the supervision of John Stafanie, a Coastal employee; that he, DeDiglio, had never seen any Navy sailors erecting any scaffolding and that he had never heard of any Navy sailors doing any such work. Mr. DeDiglio looked at the photos (Exhs. 1–6) and testified that such scaffolding would not have been appropriate for use in the mess deck because there was not sufficient headroom therefor and that anyone putting insulation in the ceiling would have done so from a step ladder or a stool.

Captain Eugene Razzetti, commanding officer on the ship, said that he was present on the ship on every day during June while she was in dry dock and he does not recall any staging or scaffolding on the mess deck and that no scaffolding was ever removed by any Navy sailors unless the same blocked a hatchway or otherwise presented a fire hazard or if the job had been completed and there was no further use for any scaffolding on a particular site. He further testified that no Navy men ever brought on board or erected any scaffolding on the ship while she was in dry dock. He also testified that the ship's crew did not eat aboard their ship while she was in dry dock, but rather ate on a berthing barge located across the pier.

There is no question, but that plaintiff injured his knee at some point at or about the 26th day of June 1985; the sole question is whether plaintiff proved by a preponderance of the evidence that some negligence on the part of the defendant was a proximate cause of such injury.

In the Court's opinion, plaintiff has not sustained his burden of proof.

The Court credits the testimony of Captain Razzetti and Superintendent DeDiglio that no scaffolding of the type depicted in the photographs produced by the plaintiff was erected on the mess deck on June 26, 1985. Mr. DeDiglio testified that it would not have been feasible to do so and any person doing insulation work in that area would have used a step ladder or stool. Mr. DeDiglio's testimony was corroborated by Captain Razzetti who testified that he does not recall any staging or scaffolding on the mess deck.

Moreover, the suggestion that the Navy crewmen removed the scaffolding every Friday afternoon and reinstalled the same every Monday morning so that the crew might eat their meals in the mess hall over the weekend was destroyed by the uncontradicted testimony that no meals were served to the crew on the ship during the period in which it was in dry dock. Furthermore, it is undisputed that the responsibility for the installation of all scaffolding and similar equipment was that of Coastal

and not that of the defendant or of the ship or any of its crew. Finally, Captain Razzetti testified that he first learned of plaintiff's claim in this case a year ago from the government's attorneys and that the ship had never received any report of the plaintiff's alleged injury when the same occurred in June of 1985, although all other accidents and similar incidents were reported to the Captain and his officers while the ship was in dry dock.

On the basis of the Supreme Court's holdings in *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), and *Foremost Insurance Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), the Second Circuit and other courts have held that in order for a tort claim to be within the federal courts' admiralty jurisdiction, the alleged wrong must (1) have occurred on navigable waters ("situs") *and* (2) "bear a significant relationship to traditional maritime activity" ("status"). *Executive Jet Aviation*, 409 U.S. at 254–61, 93 S.Ct. at 497–501; *Foremost*, 457 U.S. at 673, 102 S.Ct. at 2657; *Keene Corp. v. United States*, 700 F.2d 836, 843 (2d Cir. 1983); *White v. Johns–Manville Corp.*, 662 F.2d 234, 239 (4th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982); *Nelson v. United States*, 639 F.2d 469, 472 (9th Cir.1980); *see also Kayfetz v. Walker*, 404 F.Supp. 75, 76 (D.Conn. 1975).

■ Under the tests set out above, plaintiff's claim is not cognizable in admiralty. While the claim may bear a significant relationship to traditional maritime activity, the first prong of the jurisdictional test, whether the alleged tort has a maritime locality, has not been met in this case. In *J.M.L. Trading Corp. v. Marine Salvage Corp.*, 501 F.Supp. 323 (E.D.N.Y.1980), this Court held that dry docks when affixed to the land and in use as dry docks are not ships or vessels subject to admiralty jurisdiction. The great majority of decisions concerning the "reach" of admiralty jurisdiction support the principle of law that when a dry dock is affixed to the shore, it is not within admiralty jurisdiction primarily because it does not travel upon navigable waters, has no motive power of its own, and has no steering mechanism of its own. *See, e.g., Cope v. Vallette Dry Dock Co.*, 119 U.S. 625, 627, 7 S.Ct. 336, 337, 30 L.Ed. 501 (1887); *DeMartino v. Bethlehem Steel Co.*, 164 F.2d 177, 179 (1st Cir.1947); *J.M.L. Trading Corp.*, 501 F.Supp. at 324. The Fourth Circuit further supported this principle when it stated that a dry dock in service, permanently moored to the land, is basically an extension of the land, i.e., a wharf or a dock. *See United States v. Moran Towing & Transportation Co.*, 374 F.2d 656, 662 (4th Cir.1967). In the case at bar, the USS THORN was moored in Brooklyn Navy Yard on or about March 6, 1985 and dry docked on June 26, 1985, the day the accident is alleged to have occurred. The dry dock was actually an extension of the land being affixed to the land and not mobile. Moreover, the USS THORN may not be treated like other navigable vessels on the basis that it interrupted the flow of navigation and commerce. Therefore, the facts of this situation compel the conclusion that admiralty jurisdiction clearly does not extend to Coastal's dry dock or workers injured in a non-maritime situs.

Even though there is no jurisdiction over plaintiff's claim in admiralty, federal jurisdiction exists under the Federal Torts Claims Act ("F.T.C.A."), 28 U.S.C. § 1346(b) (1982).[1] The F.T.C.A. requires that a claimant against the federal government file an administrative claim with the appropriate agency prior to institution of the suit. 28 U.S.C. § 1346(b) (1982); 28 U.S.C. § 1402(b) (1982); 28 U.S.C. §§ 2671– 80 (1982). Title 28 U.S.C. § 2675(a) provides in pertinent part:

> An action shall not be instituted upon a claim against the United States for money damages for injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall

---

**1.** These jurisdictional bases are mutually exclusive. The F.T.C.A. specifically provides that it does not apply to suit in admiralty against the United States. 28 U.S.C. § 2680(d).

have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.... The provision of this subsection shall not apply to such claims as may be asserted under the Federal Rules of Civil Procedure by third party complaint, cross-claim, or counterclaim.

The requirement that a notice of claim be filed is jurisdictional and cannot be waived. *Keene Corp. v. United States*, 700 F.2d 836 (2d Cir.1983); *House v. Mine Safety Appliances Co.*, 573 F.2d 609, 617 (9th Cir.1978), *cert. denied*, 439 U.S. 862, 99 S.Ct. 182, 58 L.Ed.2d 171 (1978). Moreover, because the F.T.C.A. constitutes a waiver of sovereign immunity, the procedures set forth in section 2675 must be adhered to strictly. *Keene*, 700 F.2d at 841; *Three–M Enterprises, Inc. v. United States*, 548 F.2d 293, 295 (10th Cir.1977); *Brown v. General Services Administration*, 507 F.2d 1300, 1307 (2d Cir.1974), *aff'd*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed. 2d 402 (1976).

Since plaintiff has alleged that he filed a notice of claim on or about October 31, 1985, it is clear that jurisdiction exists under the F.T.C.A. Furthermore, the venue is properly placed in the Eastern District of New York under 28 U.S.C. § 1402(b), because the plaintiffs reside in this District and it is in this District where the incident occurred.

The F.T.C.A. further provides that the district courts shall have exclusive jurisdiction of civil actions against the United States for money damages for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Since the government is to be treated as a private person, the liability of the United States, if any, for injury or death to an employee of a government employee will depend upon the law of the situs of the tort. 28 U.S.C. § 2672; 28 U.S.C. § 1346(b); *Kropp v. Douglas Aircraft Co.*, 329 F.Supp. 447, 467 (E.D.N.Y. 1971).

■ Although the Government is clearly liable for its own negligence under the F.T.C.A., the United States Supreme Court and a court in the Eastern District have held that claims not specifically grounded in negligence, such as those of absolute liability, are not within the purview of the F.T.C.A., *Laird v. Nelms*, 406 U.S. 797, 799, 92 S.Ct. 1899, 1900, 32 L.Ed.2d 499 (1972); *Kropp*, 329 F.Supp. at 470. In the instant case, plaintiff claims that he fell from an allegedly defective scaffold while working for Coastal in the "mess" deck of USS THORN, a public vessel of the United States. The weight of the credible testimony shows that Coastal, not the Navy, erected all the required scaffolding under the overhaul contract. The height of the "mess" deck makes it extremely unlikely that a scaffold of the size plaintiff claimed to have fallen from was present in that space. Plaintiff offered no evidence that the scaffold on which he claims he was injured was defective. In fact, his own photographic evidence contradicts his claim of a defect. Even if there was a defective scaffold, however, plaintiff failed to prove actual knowledge of such defect on the part of the United States. Since plaintiff failed to prove any negligence on the part of the United States that caused or contributed to his injuries, the United States is not liable under the F.T.C.A.

■ Title 28 U.S.C. § 2671 provides that a contractor with the United States does not fall within the definition of "federal agency," but this does not mean that a contractor may not be a federal "employee." 28 U.S.C. § 2671 (1982). If the contractor is deemed an agent or employee of the Government, then the United States may be liable for the negligence of the contractor under the doctrine of respondeat superior. *Kropp*, 329 F.Supp. at 468; *see Ira S. Bushey & Sons, Inc. v. United States*, 276 F.Supp. 518, 524 (E.D.N.Y. 1967), *aff'd*, 398 F.2d 167 (2d Cir.1968).

The degree of control exercised by the employer over the operations of the contractor's work is the primary consideration in determining the nature of the relationship between the employer and the contractor. *Kropp*, 329 F.Supp. at 468. The Tenth Circuit and a Court in the Eastern District have held that the fact that the work and duties of the contractor and of his employees originate in a contract issued by the Government does not necessarily impose a duty by it to the employees where there was not such an affirmative control and direction by Government officials over the employees. *United States v. Page*, 350 F.2d 28, 31 (10th Cir.1965), *cert. denied,* 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966); *Kropp*, 329 F.Supp. at 468. In other words, an independent contractor relationship will exist where the Government's major concern is in the end product, but the master-servant relationship will exist where the Government's primary concern is also with the means by which the finished product is built.

The majority of the courts have held the United States free of liability despite the existence of several contract provisions reserving a general right of supervision and control over work and establishing safety standards. *Craghead v. United States,* 423 F.2d 664, 666 (10th Cir.1970); *Wright v. United States,* 404 F.2d 244, 246 (7th Cir.1968); *Yates v. United States,* 365 F.2d 663, 668 (4th Cir.1966); *Page,* 350 F.2d at 30; *Grogan v. United States,* 341 F.2d 39, 42–43 (6th Cir.1965); *Roberson v. United States,* 382 F.2d 714, 721 (9th Cir.1962); *Strangi v. United States,* 211 F.2d 305, 308 (5th Cir.1954). However, a greater degree of control by the Government may warrant the imposition of a duty of care not imposed when the Government's only role is that of an overseer. *Kropp*, 329 F.Supp. at 469.[2] The mere fact that the Government owns the property being worked on by the contract is insufficient control to attach liability to the United States for negligence of the contractor. *Kropp*, 329 F.Supp. at

470. In other words, the Government is not liable under the F.T.C.A. merely because of its ownership of potentially dangerous property, since such liability would be tantamount to the imposition of absolute liability without regard to negligence.

In sum, the contract imposed no obligations on the United States with respect to the USS THORN. As required under the contract, Coastal furnished the scaffold, brought it aboard the vessel, and its Scaffolding Department erected it. Therefore, the Government did not have possession or control of the scaffolding following the execution of the contract. It was Coastal's duty to provide a safe workplace for plaintiff and to take safeguards with respect to the scaffold and the working conditions. Since plaintiff took his orders from Coastal only, the USS THORN personnel had no duty to inspect or supervise the lagging work plaintiff performed or to inspect the scaffold if any existed. Since plaintiff has failed to prove negligence on the part of the Government, plaintiffs' case must be dismissed with costs to be awarded to defendant United States.

SO ORDERED, submit judgment on notice.

---

2. Where the Government actively participates in the operation of the project, i.e., managing details of the work and supervising employees directly, it may be necessary to impose a duty of care not imposed when the degree of the Government's control is merely one of an overseer, *Kropp*, 329 F.Supp. at 469.